**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER ZELNIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:22-CV-269-JVB-JEM |
| | ) | |
| KIMBERLY O'CONNOR, OSCAR | ) | |
| MARTINEZ, and TODD WASMER, | ) | |
| Defendants. | ) | |

**<u>OPINION AND ORDER</u>**

This matter is before the Court on a Joint Motion for Summary Judgment by All Defendants [DE 36], filed on August 23, 2024, by Defendants Kimberly O'Connor, Oscar Martinez, and Todd Wasmer. Plaintiff Christopher Zelnis responded on September 18, 2024, and a joint reply was filed on October 16, 2024.

On September 10, 2022, Zelnis filed a complaint against O'Connor, Martinez, and Warner in this Court, alleging that his rights under the First Amendment were violated when he was disciplined at work after he posted content to social media. Zelnis seeks declaratory relief and monetary damages.

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying the evidence, if any, which it believes demonstrates the lack of a genuine issue of material fact. *Id.* at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, the burden shifts to the non-moving party to showing that an issue of material fact exists. *Keri v. Bd. of Tr. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986).

## MATERIAL FACTS

### A. Anonymous Complaint Letter

On March 27, 2022, Lake County Jail Deputy Warden Kimberly Cox received an inter-building envelope addressed to her in the personnel mailbox. (Defs.' Ex. 6, Bates 946, ECF No. 38-6). Inside the envelope was an anonymous and typed complaint letter alleging that Sergeant Christopher Zelnis and Correctional Officer Christopher Rak were creating a hostile work environment in the jail. *Id.*; (Wasmer Dep. 44:23-45:8, ECF No. 38-8). The same day, Cox forwarded the letter via email to Lake County Jail Warden Todd Wasmer. (Defs.' Ex 6, Bates 946, ECF No. 38-6). The letter alleged that Zelnis was watching online content and making social media

posts while on duty in the jail. (Defs.' Ex. 6, Bates 929-31, ECF No. 38-6); (Wasmer Dep. 10:23-13:11, ECF No. 38-8). The letter also alleged that Zelnis was creating a hostile work environment. (Defs.' Ex. 6, Bates 929-31, ECF No. 38-6). The letter included printed copies of social media posts allegedly made by Zelnis. *Id.*

At the time, Wasmer was the highest-ranking person at the jail, and he reported directly to Sheriff Oscar Martinez. (Wasmer Dep. 7:24-8:3, ECF No. 38-8). As warden, Wasmer's general responsibilities were to oversee all operations of the Lake County Jail, including overseeing jail employees. *Id.* 8:4-8.

Zelnis, at the time, was a sergeant and was in charge of a "turn" (that is, a shift) of correctional officers at the jail. *Id.* 46:24-47:12. Sergeant is a merit position in the Lake County Jail earned through testing and an interview process. (Zelnis Dep. 16:6-21, ECF No. 38-10). As a sergeant, Zelnis's duties included assigning correctional officers to work posts in the jail, scheduling officer work assignments and off days, working with other sergeants and lieutenants to supervise correctional officers on duty in the jail, addressing jail emergencies, and filling in for other correctional officers when needed. *Id.* 12:10-14:7. Sergeants are also responsible for monitoring and handling security and safety for the entire jail facility. *Id.* 15:18-16:1.

The Sergeant's Office in the jail is where the turn sergeant on duty is normally located if there are no incidents to address and things are running smoothly in the jail. Correctional officers working in the jail would expect to find the turn sergeant who is on duty in the Sergeant's Office. (Wasmer Dep. 48:2-14, ECF No. 38-8); (Zelnis Dep., 93:1-94:10, ECF No. 38-10). The county computer in the Sergeant's Office can be used by sergeants to access the internet to conduct jail business. (Wasmer Dep. 48:15-22, ECF No. 38-8). Wasmer testified that he does not want sergeants working in the jail to engage in any online internet activity that is unrelated to their jail

duties, *id.* 47:21-48:1, and that it violates jail policy for correctional officers to go online and conduct personal business, such as posting on Facebook or watching political videos (regardless of the political bent of the content they are watching), while they are on duty.[1] *Id.* 12:7-13; 48:23-49:4.

After reviewing the anonymous letter with its attached Facebook posts, Wasmer sent a letter to Sheriff Martinez on April 5, 2022, requesting an internal investigation into the allegations expressed in the anonymous complaint. (Zelnis Dep. 49:5-50:11, ECF No. 38-10); (Defs.' Ex. 6, Bates 947, ECF No. 38-6).

Martinez testified that he was concerned by the letter and attached Facebook posts. (Martinez Dep. 11:19-12:3, ECF No. 38-11). Martinez also testified that he was not concerned that Zelnis had filed EEOC complaints, nor did he have an issue with the letter referring to Zelnis as being "pro Trump." *Id.* 12:12-18. Watching online videos while on duty, however, was a concern because a supervisor who is watching online videos is not performing his duties as a supervisor. *Id.* 12:19-13:8. Based on the information he reviewed, Martinez felt there were reasonable grounds to authorize an internal investigation. *Id.* 24:22-25:3. On April 11, 2022, Martinez approved Wasmer's request and authorized an internal investigation into the allegations in the anonymous letter. *Id.* 47:15-19; (Wasmer Dep., 50:18-51:2, ECF No. 38-8).

**B. Relevant Facebook Posts**

Several Facebook posts were attached to the anonymous letter, and some of these posts were addressed in deposition testimony. *See* (Defs.' Ex. 6, Bates 932-936, ECF No. 38-6). The Facebook posts relevant here are six posts made by an account under the name "Fenrir Logan."

---

[1] Zelnis asserts a dispute over this fact because no such written policy has been produced, but Zelnis does not comply with his burden to submit evidence to create an evidentiary dispute with Wasmer's testimony that the policy existed. *See* N.D. Ind. L.R. 56-1(b)(2)(C) (requiring citation to evidence supporting each dispute of fact).

(Ex. 6, Bates 932-937). During the internal investigation, Zelnis admitted he was "Fenrir Logan" on Facebook. (Martinez Dep. 50:3-7, ECF No. 38-11).

Zelnis testified that his "Fenrir Logan" Facebook page was a private, personal page for himself, his friends, and his immediate acquaintances. (Zelnis Dep. 8:1-9, ECF No. 38-10). Among the people invited to view the account were Lake County Jail Deputy Warden Fotinos, Laura Lunkes-Wilson, Ryan Leoni, Richard John, and James Rodeo. *Id.* 50:3-7, (Defs.' Ex. 6, Bates 932-37). Lunkes-Wilson is a former Lake County Jail employee, Leoni is a current Lake County Jail employee, John is unknown to Wasmer and Martinez, and Rodeo is unknown to Wasmer. (Wasmer Dep. 32:6-10, 40:11-14, 42:13-18, 43:19-24, ECF No. 38-8); (Martinez Dep. 31:1-3, ECF No. ECF No. 38-11).

A Zelnis Facebook post depicting skulls showed a series of normal human skulls and then labeled a primate or monkey skull as "admin," which Wasmer inferred to be a reference to the Lake County Jail administration because Zelnis is an employee of the Lake County Jail. (Wasmer Dep. 18:22-19:24, ECF No. 38-8); *see also* (Defs.' Ex. 6, Bates 992, ECF No. 38-7 (copy of Facebook post)). The post did not mention the Lake County Jail by name. (Defs.' Ex. 6, Bates 992, ECF No. 38-7). Zelnis's commentary (as Fenrir Logan) on the image was "They devolve quickly." *Id.*

Another post referenced the jail's COVID protocols and referenced the length of correctional officer shifts. (Defs.' Ex. 6, Bates 993, ECF No. 38-7).[2] Wasmer testified that this is

---

[2] The complete body of this post reads:

> The looks on peoples faces when they ask you about Covid and the jail and you tell them the only real people getting stuck in numbers with bad effects are the officers because we are forced to wear unhealthy masks all day for 8 or 16 hours (when their eyes bulged to realize what they are wearing as I'm saying this) lol great

(Defs.' Ex. 6, Bates 993, ECF No. 38-7).

a policy violation because employees are not supposed to discuss operations of the jail, and the jail's COVID protocols were part of Lake County Jail operations. (Wasmer Dep. 21:2-24, ECF No. 38-8); *see also* (Martinez Dep. 29:15-30:1, ECF No. 38-11). Zelnis has declared under the penalty of perjury that there is no rule or policy that prohibits an employee from discussing jail shifts.[3] (Zelnis Decl. ¶ 18, ECF No. 40-20). Martinez also expected Zelnis, as a sergeant, to report his safety concerns immediately to his supervisor before posting about the matter on Facebook. (Martinez Dep. 30:9-22, ECF No. 38-11).

The next Facebook post references emergency scheduling and alleges that the "Admin and Union" are "telling only their buddies" about it and that "[t]his is what they think of you."[4] (Defs.' Ex. 6, Bates 994, ECF No. 38-7). Martinez considered this to be discussing and revealing jail operations that could jeopardize the safety of correctional officers and inmates in the jail. (Martinez Dep. 36:8-18, ECF No. 38-11). Wasmer also noted that this post violated policy by speaking disparagingly of the jail administration. (Wasmer Dep. 27:18-23, ECF No. 38-8).

The fourth Facebook post reads: "Me when the admin sends a nonsensical e-mail and I get to respond accordingly. ... When do we get another supervisor meeting? I've got a show planned... maybe a few knock knock jokes." (Defs.' Ex. 6, Bates 995, ECF No. 38-7 (ellipses in original)). As a comment on the post, Zelnis added "Knock knock,…. Who's there? principles…

---

[3] Also in his declaration, Zelnis states that shift information is included in the relevant collective bargaining agreements, which become part of the public record of the Lake County Council. *Id.* ¶¶ 19-21; *see also* (Pl.'s Ex. 17, Bates 1516, ECF No. 40-16 (provision of collective bargaining agreement describing work schedules)).

[4] The complete body of this post reads:

> Well, the Administration AND the Union, know we're going to 'some' type of 'emergency schedule, and that it will likely be implemented by the end of the month, but despite this knowledge aren't telling anyone, so they can be surprised last minute notice. This is what they think of you. Members of the Admin and Union are both running around telling only their buddies… but again, this is something the Officers did to themselves.

(Defs.' Ex. 6, Bates 994, ECF No. 38-7 (ellipses in original)).

principles who?.... I knew you didn't know any principles!" *Id.* (ellipses in original). Martinez considers this a disparaging message about the administration and notes that Zelnis, as a sergeant, should be acting accordingly rather than putting such comments out on a public platform. (Martinez Dep. 34:7-35:7, ECF No. 38-11).

Yet another Facebook post refers to staffing and hiring issues and refers to the workplace as a "hell hole."[5] (Defs.' Ex. 6, Bates 996, ECF No. 38-6). Wasmer testified that this violates policy by disparaging the administration. (Wasmer Dep. 37:10-19, ECF No. 38-8). Wasmer also considers it a security issue if members of the public know when shift changes happen due to the potential to schedule escape attempts or assaults on staff during those times. *Id.* 55:12-21.

Finally, Zelnis posted to Facebook a group of pictures (some edited) from the movie Basic Instinct. (Defs.' Ex. 6, Bates 997, ECF No. 38-7). Wasmer describes it as a series of pictures that appear to convey that Zelnis is looking into the vagina of a woman from that movie. (Wasmer Dep. 29:19-30:22, ECF No. 38-8). Martinez testified that, through photoshopping, the post makes it appear that Zelnis is one of the "investigators" in the movie scene and Zelnis adds as text to this post that he "[a]lways wanted to be a detective." (Martinez Dep. 43:19-44:6, ECF No. 38-11); (Defs.' Ex. 6, Bates 997, ECF No. 38-7). Martinez testified that he considers the post disrespectful to women and that policy states that a correctional officer or police officer will not do anything off

---

[5] The complete body of this post reads:

> Sooo, reliable word on the street is we're going to 12 hour shifts… and possibly on the very next pay period, which is only 6 days away (this is the only part im not sure of)… meaning they'll likely announce the change with only 5 days notice… why such short notice? well screw your families and lives right? …. Lol the newbies who wanted 12s are going to see that this place can be even more of a hell hole.. you are about to be even more over worked and frozen WAY MORE … and even better, its not the every other weekend off schedule you all wanted… lol, going to suck but man did you all dig yourselves into a hole, if you thought it could't [*sic*] get worse… you're about to find out…… and how do you think this is going to impact hiring? …. peace … even im looking for other options.

(Defs.' Ex. 6, Bates 996, ECF No. 38-7 (ellipses in original)).

duty that will bring disrepute or discredit to the organization. (Martinez Dep. 43:3-55:6, ECF No. 38-11).

The writer of the anonymous letter was able to screenshot all of the Facebook posts and attach them to the letter, so Wasmer testified that the posts were "public." (Wasmer Dep. 38:7-24, ECF No. 38-8). Zelnis testified that the account was "private," meaning that people had to be invited or let into the account. (Zelnis Dep. 49:21-50:10, ECF No. 40-8).

At his May 6, 2022 interview with internal affairs investigator Doug McClusky, Zelnis stated that, as of May 5, 2022, Zelnis had purged his Facebook page (requesting of Facebook that the entire page be taken down permanently) and ceased posting any remarks, comments, and opinions on the Lake County Jail. (Zelnis Dep. 41:18-21, 42:22-43:1, 51:13-52:16, ECF No. 40-8). As far as Zelnis knows, one would need "special technical access" in order to view the page now. *Id.* 52:17-25.

Zelnis testified that he was unaware that he was under investigation for the Facebook posts during the time before his interview with McClusky and that he learned he was under investigation for the posts when "Mr. McCluskey [*sic*] pulled [him] into his IA room." *Id.* 39:18-24; 41:22-7. Zelnis stated at his deposition that he had purged the Facebook page because "things started to get dramatic in the facility," he was "getting pulled into things [he] shouldn't be that [he's] not involved in," and he "wanted to just let the drama stop and try to let things heal in the facility with regard to the relationships." *Id.* 38:13-39:13.

### C. Internal Affairs Investigation

Doug McClusky is an internal affairs investigator with the Lake County Sheriff's Department, and his duties include conducting internal investigations into cases referred to him by the sheriff. (McClusky Dep. 7:18-8:1, ECF No. 38-12). Via a hard copy memorandum, Martinez

asked McClusky to conduct an internal investigation into the allegations in the anonymous complaint letter. *Id.* 16:6-18; (Martinez Dep. 22:7-9, ECF No. 38-11).

Martinez testified that McClusky's internal investigation was an independent investigation. (Martinez Dep. 22:24-23:2, ECF No. 38-11). Martinez did not speak to McClusky about the anonymous letter or the internal investigation. *Id.* 22:5-11; 22:24-23:2. Wasmer testified that he did not participate in McClusky's internal investigation. (Wasmer Dep. 51:11-13, ECF No. 38-8).

McClusky concluded most of the complaints in the anonymous letter were unsubstantiated, but he also concluded that Zelnis "was involved in some activities on duty that he should have precluded himself from getting involved in." (McClusky Dep. 17:8-17, 28:24-19:10, ECF No. 38-12). McClusky's "Investigators Interview Summary" reports that Zelnis "states that he can's [*sic*] say he never generated Facebook posts while on duty however he claims that the posts that he wrote were not politically motivated and at no time did his posts provide any confidential information or compromise the safety of the facility or its staff." (Defs.' Ex. 6, Bates 956, ECF No. 38-6). Zelnis asserts that the report reveals that he said that he "can" say that he never posted on duty. However, both the context of the extended quotation included above and McClusky's deposition testimony ("[h]e states that he can't say he never generate Facebook posts while on duty") make clear that the typographical error of "can's" should be "can't" and not "can." *See* (McClusky Dep. 19:24-20:2, ECF No. 38-12). Further, after discussion of the typographical error, Zelnis's counsel agreed at McClusky's deposition that the sentence should read "can't." (McClusky Dep. 30:6-31-14, ECF No. 40-11 (counsel's statement at 30:23-31:1)). No reasonable jury could find that the *report* states otherwise.

However, Zelnis, under oath, stated that he told McClusky that he never posted "at work or on-duty" but "may have posted when I was on a break" either "in or out of the building" and

that such time would have been off-duty time. (Zelnis Decl. ¶¶ 6, 7, ECF No. 40-20). Also under

oath—this time at his deposition—Zelnis admitted that it is "highly possible" that he "could have

said" what McClusky reported in the interview summary. (Zelnis Dep. 44:7-21). Zelnis's testimony

continued to clarify that "we would take breaks and we were permitted our cellphones" while

maintaining that he never posted while on duty. *Id.* 44:1-6, 22-25. Zelnis also declared that, had

McClusky asked him about the Facebook posts "in issue" Zelnis would have told him that the

posts were made when he was home and off duty. (Zelnis Decl. ¶ 8, ECF No. 40-20).

McClusky testified that he concluded on the basis Zelnis's statements to him that Zelnis

had been posting on Facebook while on duty. (McClusky Dep. 19:24-20:9, ECF No. 38-12).

McClusky also testified that he received the statements of two correctional officers, one of whom

told McClusky that he personally saw Zelnis watching politically oriented videos while on duty,

*id.* 20:12-21, and the other of whom stated that, between December 2021 and March 2022, he had

seen Zelnis viewing politically oriented websites while on duty, *id.* 33:10-18. *See also* (Defs.' Ex.

6, Bates 962, 968, ECF No. 38-7 (interview summaries reporting the statements)). McClusky

added that Zelnis admitted to watching political videos on the computer while on duty. (McClusky

Dep. 35:6-14, ECF No. 38-12 (referencing Defs.' Ex. 6, Bates 985, ECF No. 38-7)). Zelnis disputes

that he made such an admission and identifies that the interview summary records no such

admission. *See* (Defs.' Ex. 6, Bates 956-57, ECF No. 38-6). Zelnis testified that "[p]utting the news

on in the background is like listening to the news," and "[i]t's like the radio," but "even the news

there's nothing I sat at a computer and watched. (Zelnis Dep. 59:1-3, 6-7, ECF No. 40-8).

The anonymous complaint letter also alleged a security incident where Zelnis had allowed

unauthorized persons to enter the jail through the employee entrance, a violation of jail policy.

(Defs.' Ex. 6, Bates 930, ECF No. 38-6); (McClusky Dep. 34:14-20, ECF No. 38-12). Zelnis

admitted to a January 13, 2022 security breach in which three individuals were permitted entry through an employee entrance, and Zelnis provided McClusky with a copy of the incident report Zelnis prepared in response to the breach. (Defs.' Ex. 6, Bates 978, ECF No. 38-7); (McClusky Dep. 34:24-35:5, ECF No. 38-12). Zelnis testified that discipline for this incident should not have been permitted because the incident should have been subject to the Merit Board rules that provide a 90-day timeframe for disciplinary action and his interview with McClusky occurred 113 days after the incident. (Zelnis Dep. 29:8-24, ECF No. 38-10).

McClusky compiled an investigative file at the conclusion of his investigation and gave it to Martinez. *See* (McClusky Dep. 34:1-3, ECF No. 40-11); (Defs.' Ex. 6, Bates 928-97, ECF No. 38-6, 38-7). McClusky also presented Wasmer with a written report of his findings and investigation. (Wasmer Dep. 51:14-18, ECF No. 38-8). Wasmer testified that he reviewed the report and that, based on the report, he concluded that Zelnis admitted to posting on Facebook while on duty and that Zelnis watched political videos while on duty. *Id.* 51:19-52:8.

### D. Disciplinary Report

A Lake County Corrections Division "Disciplinary Report" summarizes the allegations and charges brought against a staff member. (Wasmer Dep. 17:21-18:3, ECF No. 38-8). Martinez testified that the disciplinary report represents that an officer has been "written up" but does not indicate that the officer has been disciplined. (Martinez Dep. 17:8-23, ECF No. 38-11). The decision about discipline is made after the write-up is completed; the disciplinary options are verbal reprimand, written reprimand, or referral to the sheriff. *Id.* 17:15-17.

Kimberly O'Connor is Assistant Warden of the Lake County Jail and is in charge of the daily operations of the jail. (O'Connor Dep. 7:19-24, ECF No. 38-9). O'Connor received McClusky's report from Wasmer, reviewed it, and relied on it to prepare a disciplinary report

related to Zelnis's behavior. *Id.* 31:24-33:5. O'Connor never spoke with McClusky about the matter. *Id.* 32:14-19.

O'Connor testified that she filled out the report based on what she had seen in McClusky's report. *Id.* 33:3-5. The disciplinary report has check-marked boxes indicating violations for "Publicly discussing jail affairs off duty," "Disparaging remarks about employees or regarding the way affairs of the jail are conducted," "Disrespectful or uncourteous treatment of Superiors, subordinates, or associates," and "Any conduct unbecoming an Officer." (Pl.'s Ex. 7, Bates 988-89, ECF No. 40-7); (O'Connor Dep. 15:3-14, ECF No. 40-9). The report provides the following narrative.

> The Lake County Jail Administration as well as Lake County Human Resource Department received a complaint regarding Sergeant Christopher Zelnis. The complaint states that Sgt. Zelnis is causing a hostile work environment. The complaint included posts that Sgt. Zelnis has posted on his Facebook page. The post are [*sic*] considered unprofessional and offensive. In one post Sgt. Zelnis discusses the jail going to 12 hour shifts. In two other post [*sic*], Sgt. Zelnis is referring to Jail Administration. Sgt. Zelnis is being written up for the following:
>
> II. Personal Conduct
>     4. Corrections Officers should publicly refrain from discussing jail affairs when off duty.
>     5. Disparaging remarks regarding any employee or regarding the way the affairs of the jail are conducted.
>     21. Corrections Officers shall treat superior officers, subordinates, and associates with respect, being courteous in their relationships at all times.
> IV. Dereliction of Duty
>     10. Any conduct unbecoming an officer.

(Pl.'s Ex. 4, Bates 990, ECF No. 40-4). The report indicates that the matter is being referred to the sheriff or chief for disciplinary action. *Id.* O'Connor testified that, after filling out the disciplinary report, she gave the report to Wasmer to forward to Martinez. (O'Connor Dep. 34:5-9, ECF No. 38-9). Wasmer testified that he agreed with the disciplinary report and its conclusions. (Wasmer Dep. 18:17-19, ECF No. 38-8). Wasmer and O'Connor signed the disciplinary report. (Pl.'s Ex. 4, Bates 990, ECF No. 40-4).

The notation for a violation for publicly discussing jail affairs off duty was due to Zelnis's Facebooks posts concerning the jail. (O'Connor Dep. 16:1-11, ECF No. 38-9). Wasmer testified that correctional officers are not supposed to publicly discuss jail affairs. (Wasmer Dep. 21:19-22:8, ECF No. 38-8). In O'Connor's view, jail affairs encompass "[a]nything that has to do with the jail, anything that goes with the operations of the jail." (O'Connor Dep. 16:7-11, ECF No. 28-9). O'Connor also testified that she wrote up Zelnif for "disrespectful or uncourteous treatment of superiors, subordinates, or associates" due to the Facebook posts. *Id.* 26:13-20. The parties do not dispute that there is no written policy, rule, or Merit Board Rule that contains the specific statement "an officer cannot POST about Covid."

Wasmer testified that, as a result of his review of the investigative report, he concluded that Zelnis had been posting on Facebook and watching videos on the internet while on duty.[6] (Wasmer Dep. 52:21-53:5, ECF No. 38-8). Because of the above and "[d]ue to Sergeant Zelnis being a supervisor," Wasmer issued a memo to Martinez requesting that Martinez suspend Zelnis for 60 hours (representing five days at 12 hours per day) without pay for the infractions found during the internal investigation. *Id.* 55:3-11; 57:4-12. Wasmer added that the disciplinary report was attached to the memo. *Id.* 17:10-13. Wasmer explained that he considered the complete investigation in its totality when making his recommendation to Martinez and that he believes that the recommended suspension was justified. *Id.* 13:23-14:9, 23:7-10.

Martinez testified that he looked over the report from Wasmer, reviewed the internal affairs investigation, and was concerned about the violations of department policy and procedures and about the safety of the inmates and officers. (Martinez Dep. 15:11-21, ECF No. 38-11).

---

[6] As Zelnis identifies, Wasmer also testified that he was unable to determine whether any of the specific Facebook posts from Zelnis's account that were attached to the anonymous letter were posted while on duty. (Wasmer Dep. 60:21-63:4, ECF No. 40-10).

Martinez stated that he concluded that Zelnis had been watching videos while on duty based on the investigation and Zelnis's own admission. (Martinez Dep. 16:14-22, ECF No. 38-11). Martinez also testified that he concluded from the final paragraph on Bates 956 that Zelnis had admitted to posting on Facebook while on duty. *Id.* 49:14-21; *see also* (Defs.' Ex. 6, Bates 956, ECF No. 38-6 ("Regarding the allegations contained in the anonymous letter, [Zelnis] states that he can'[t] say he never generated Facebook posts while on duty."). Zelnis argues that the fact that he was written up for "discussing jail affairs when off duty" indicates that the Facebook posts were made while Zelnis was off duty. *See* (Defs.' Ex. 6, Bates 990, ECF No. 38-7). Zelnis also asserts that the only possible off-duty activity referenced in the narrative portion of the disciplinary report is the Facebook activity. *See* (Pl.'s Ex. 4, Bates 988-90, ECF No. 40-4).

### E. Discipline Imposed

On June 15, 2022, Martinez approved Wasmer's recommendation and issued a 60-hour suspension, without pay, to Zelnis. (Martinez Dep. 48:21-24, ECF No. 38-11). Martinez testified that he reviewed the entire internal investigation file, including the anonymous letter, Facebook posts, and Facebook pictures before making a disciplinary decision and that he relied on McClusky's report of the investigation in making the decision on disciplinary action. *Id.* 22:7-11, 23:3-14. Martinez also testified that, based on his review of the investigative materials, he concluded that Zelnis had been watching videos on the jail computer that were unrelated to jail business. *Id.* 52:5-10. Martinez continued, testifying that he also concluded, based on statements attributed to Zelnis in the investigative file, that Zelnis had been posting on Facebook while on duty. *Id.* 52:11-15.

Martinez further testified that the internal affairs investigation revealed violations for neglect of duty, publicly discussing jail affairs while off duty, disparaging remarks, and that a

14

civilian was brought into the back part of the jail without proper security checks. *Id.* 15:13-16:5. The incident regarding the civilian is not listed in the disciplinary report. (Defs.' Ex. 6, Bates 988-90, ECF No. 38-7). Martinez also testified that the decision to discipline Zelnis was not based on the content of the Facebook posts but rather based on the fact that Facebook posts were made while Zelnis was on duty. (Martinez Dep. 53:9-12, ECF No. 38-11). It was Martinez's testimony that:

> The decision was made to discipline [Zelnis] based on allowing – the security risk of allowing the female and two other males to gain access into our jail, the neglect of duty of that, the watching videos while on duty and making a social media post while on duty.

*Id.* 53:18-23.

Zelnis, while disagreeing as to appropriateness of the actions taken against him because of factual and other disputes, testified that, as a hypothetical matter, watching videos while on duty and letting civilians into the jail are actions for which the sheriff can issue discipline. (Zelnis Dep. 27:23-29:12, 31:21-32:14, ECF No. 38-10).

## ANALYSIS

Defendants argue that there is no genuine issue of material fact related to Zelnis's First Amendment retaliation claim and that Defendants are entitled to judgment as a matter of law. "The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech." *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). A public employee seeking relief for retaliation for exercise of First Amendment rights must show: "first, that [they] engaged in constitutionally protected speech; second, that [they] suffered a deprivation likely to deter protected speech; and third, that [their] protected speech was a motivating factor in the deprivation and ultimately, if the public employer cannot show it would have inflicted the deprivation anyway, its but-for cause." *Harnishfeger v. United States*, 943 F.3d 1105, 1112-13 (7th Cir. 2019).

15

Defendants' first argument is that Zelnis did not engage in constitutionally protected speech. Defendants also argue, in the alternative, that even if the speech at issue has constitutional protection the speech was not a motivating factor for Zelnis's five-day suspension. As a final argument, Defendants argue that they are entitled to qualified immunity and that Defendants Wasmer and O'Connor are entitled to summary judgment because they did not make the decision to suspend Zelnis. The Court agrees with Defendants regarding their first argument and grants summary judgment in their favor on that basis.

A public employee's speech receives constitutional protection if (1) the employee made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) the employee's "interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016) (quoting *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)). "Whether a government employee's speech is protected by the First Amendment is a question of law that the district court properly [withholds] from the jury, even though it may [require] predicate factual determinations." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002).

The Court must first determine what speech is at issue. Defendants identify that Zelnis only directly provides one of the Facebook posts—the one found at Bates 996—in his complaint. Zelnis counters that his complaint alleges he "posted to social media (a presentation to the public) as to work conditions at the jail, especially [as] to complaints of overbearing shift assignments for jail correctional officers. *By example*, the following: [text of Bates 996]." (Compl. 2-3, ECF No. 1 (emphasis added)). In Zelnis's view, he provided one example but did not restrict his argument to only the one Facebook post. Because, as will be shown below, none of the speech contained in the six Facebook posts can withstand Defendants' summary judgment motion, the Court assumes for

16

the purposes of resolving this motion that all six Facebook posts are sufficiently alleged in the complaint to be at issue.

### A. Did Zelnis Speak as a Private Citizen?

"When determining whether a plaintiff spoke as an employee or as a citizen, [courts] take a practical view of the facts alleged in the complaint, looking to the employee's level of responsibility and the context in which the statements were made." *Abcarian v. McDonald*, 617 F.3d 931, 937 (7th Cir. 2010) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008)). "The critical question" when determining whether speech was made as an employee or private citizen "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). That speech "concerns information acquired by virtue of . . . public employment" is not dispositive. *Id.* Instead, "[t]he test for distinguishing private speech from employee speech is whether the employees speak 'pursuant to their official duties.'" *Ulrey v. Reichhart*, 941 F.3d 255, 259 (7th Cir. 2019) (quoting *Spiegla v. Hull* 481 F.3d 961, 965 (7th Cir. 2007)).

As outlined in the material facts above, Zelnis's Facebook account under the name Fenrir Logan was his personal account. Wasmer testified that correctional officers were not to talk about jail affairs publicly, so the posts about the jail administration, mask policies, and scheduling are not within Zelnis's official duties. Neither is the Basic Instinct post plausibly made according to Zelnis's official duties. Zelnis made the posts as a private citizen.

### B. Did the Speech Address a Matter of Public Concern?

A matter of public concern is a "legitimate news interest" or "a subject of general interest and of value and concern to the public at the time of publication." *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014). "Speech that serves a private or personal interest, as

opposed to a public one, does not satisfy the standards for First Amendment protections." *Houskins v. Sheahan*, 549 F.3d 480, 491-92 (7th Cir. 2008). When speech is "made for purely personal reasons rather than a desire to air the merits of the issue," it is less likely to be considered a matter of public concern. *Smith v. Fruin*, 28 F.3d 646, 652 (7th Cir. 1994); *see also Lantz v. Off. of Jackson Twp. Tr.*, 938 F. Supp. 2d 810, 817 (N.D. Ind. 2013). "Whether a government employee's speech addresses a matter of public concern depends upon the content, form, and context of [the speech] as revealed by the whole record." *Gustafson*, 290 F.3d at 906-07 (internal quotation marks and citation omitted; alteration in original). The Court is to "look at the overall objective or point of the speech, as ascertained by those three factors," of which "content is the most important." *Kubiak v. City of Chicago*, 810 F.3d 476, 483 (7th Cir. 2016).

Five of the six Facebook posts address the jail administration, COVID precautions, and shift scheduling. The first post, involving an image of skulls and labelling a primate skull as "admin," does not adequately implicate a matter of public concern. It is a veiled expression of a personal grievance Zelnis had with the jail administration and conveys no real substance on a matter of public concern. *See Graber v. Clarke*, 763 F.3d 888, 898 (7th Cir. 2014) ("If the objective of the speech is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern." (alteration marks and citation omitted)).

In Zelnis's second Facebook post, he discusses COVID, officers wearing masks during their shifts, and the subsequent effects. During the time the post was made, the effect of wearing masks to stem the spread of COVID and any attendant side effects was without question a subject of general interest and of value and concern to the public.[7] This post is on a matter of public concern.

---

[7] The post is dated January 29 with no year listed. The Court's analysis holds equally true regardless of whether the post was made in 2021 or 2022.

The gist of the third Facebook post is that Zelnis is upset that the jail administration and corrections union know that an emergency schedule would soon be implemented but only the "buddies" of the administration and union had been informed. The thrust of the communication is Zelnis's complaint about the lack of communication from the administration and union to the jail officers and not about the emergency schedule itself. How scheduling information is passed to the jail employees is not a matter of public concern.

The fourth Facebook post appears to reference a "nonsensical" (but otherwise undescribed) email sent by jail administration, and Zelnis indicates his desire to make jokes at the administration's expense at a supervisor meeting. There is nothing to suggest that this communication was made to "air the merits" of a matter of public concern—the vague reference to a lack of principles and a nonsensical email is insufficient to raise this above the level of a personal grievance.

In the fifth Facebook post, Zelnis complains of an upcoming change to twelve-hour shifts that will possibly be implemented on short notice. He asserts that this will harm the employees' families and lives, overworking them and making the workplace "even more of a hell hole." He also posits that this will impact employee retention ("even [I'm] looking for other options") and the jail's ability to hire new employees. Overworking jail employees to the point that staffing issues may result could affect safety within the jail and the safety of the public. In this post, Zelnis is "airing the merits" of the change to 12-hour work shifts within the jail and his prediction of fallout from that change. This is speech on a matter of public concern.

Finally, Zelnis's expressed desire to become a detective, presumably based on the joking implication that it will lead to him being in circumstances similar to the interview room scene in

Basic Instinct depicted in his sixth Facebook post, is not a matter of public concern. It is not a legitimate news interest or a subject of general interest to the public.

### C. Does the Jail's Interest Outweigh Zelnis's?

Having determined that Zelnis spoke as a private citizen on matters of public concern when he made his posts about officers wearing masks at the jail and about the impact of changing to 12-hour shifts, the Court now turns to the final prong of the test for constitutional protection of speech: whether the jail's interest "as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs Zelnis's interest, "as a citizen, in commenting upon matters of public concern." *Kristofek*, 832 F.3d at 795. There are seven factors for the Court to weigh in making this determination:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [their] responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Id.* at 796 (citations omitted). The burden is on Defendants to show that the balance swings in their favor. *Harnishfeger*, 943 F.3d at 115. Resolution of this balancing test is a question of law. *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1118 (7th Cir. 2013).

The test "focus[es] on the effective functioning of the public employer's enterprise," and "[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Id*. (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). The anticipated interference need not actually occur so long as the government's prediction of disruption is reasonable, that is, supported by evidence and not simply speculative. *Id.*

"[T]he nature of the employer-employee relationship in the paramilitary context of a correctional center . . . goes to the first, second, third[,] and fifth factors [of the balancing test], in particular." *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013). The governmental employer's assessment of the risks posed by the employee speech receives "considerable deference." *Id.*

In *Volkman*, a correctional facility's casework supervisor made a phone call after hours to a state attorney to share his opinion on the prosecution of a coworker for violating policies and state laws regarding cell phone use. 736 F.3d at 1087. The correctional facility launched an internal affairs investigation into that conversation and, ultimately, the casework supervisor received a written reprimand and a five-day suspension. *Id.* The Seventh Circuit Court of Appeals found that the employer's interests outweighed the employee's. *Id.* at 1092. Of particular note in the analysis was the employee's status as a supervisor who was tasked with enforcing rules and regulations, so the employee's criticism undermined other employees' respect for the chain-of-command and the rules themselves. *Id.* The inherent "value in maintaining order and respect for their own sake in a paramilitary context" led the court to "not second-guess prison officials' conclusion that the example [the employee] set through his conduct was a detrimental one." *Id.*

Turning to the facts of Zelnis's case, the Facebook posts that the Court has determined were made by Zelnis as a private citizen on matters of public concern were critical of the Lake County Jail's mask policy during the COVID pandemic and the change to twelve-hour shifts. Zelnis berates the "newbies" who wanted the change in shift length and described the workplace as a "hell hole." Defendants note the evidence that jail employees are not permitted to speak publicly about jail operations. Defendants also argue that the submission of the anonymous complaint letter shows that Zelnis's actions had created a disruption in fact, not just a reasonably possible one. Further, the evidence shows that Zelnis, as a supervisor, was responsible for scheduling officers

21

for the twelve-hour shifts that Zelnis was speaking out against. At least three former or current jail staff members were able to access Zelnis's page, and Defendants raise the issue that it is also possible that someone connected to an individual incarcerated at the jail could have accessed the posts, and the spread of information suggesting job dissatisfaction, staffing issues, work schedules, and shift changes creates a security risk for the public, correctional officers, and those incarcerated at the jail. Defendants further assert that Zelnis wrote his posts as an insider, writing that "*we're going to 12 hour shifts,*" where a member of the general public would not use that personal pronoun.

Zelnis provides little argument to counter Defendants' position. Zelnis repeats the factors of the balancing test but does not explain how, in his view, the test is not met, other than by merely asserting that effective and efficient jail services "would not be impacted by officers lamenting in Facebook Posts, the dangers of 12-hour shifts . . . [,] defining management as having diminished capacity . . . [,] and demand for government action to better protect officers from Covid." (Resp. at 6, ECF No. 49). The Court notes that, much later in the response brief, Zelnis argues that shift information is public knowledge because it is part of the corrections union's collective bargaining agreement and that Zelnis's ability to perform his job duties were not impeded by his posts. *Id.* at 29-33.

The Court finds that Defendants have met their burden and have shown that their interest outweighs that of Zelnis. In addition to the paramilitary context of the jail, Zelnis's Facebook posts show disrespect for the chain-of-command and the jail's rules and policies as well as speaking unkindly of Zelnis's coworkers who took a different view of the twelve-hour shifts. Zelnis was posting on Facebook with the knowledge and perspective of an insider—and one responsible for scheduling jail employees for twelve-hour shifts at that. This case bears enough similarities to

*Volkman* that, especially with little rebuttal from Zelnis to Defendants' arguments, the Court can reach no other conclusion than that the factors of the balancing test weigh in Defendants' favor.

Even accepting Zelnis's position that shift information is public knowledge and therefore sharing the information on Facebook does not present a security concern, Zelnis's disrespect (as a supervisor) expressed in his Facebook posts toward those supporting the change in shift length, for his superiors, and for his place of employment in general are not matters contained within the collective bargaining agreement and bear their own implications. Additionally, while making a Facebook post while at home and off-duty may not, on its own, prevent someone from performing tasks while at work and on duty, taking a public stance against a shift length that one has the duty of scheduling is not so clearly divorced from job duties.

The interest in promoting the efficiency of the public service the jail performs through its employees outweighs Zelnis's interests as a citizen in commenting upon matters of public concern.[8]

Accordingly, the Court finds as a matter of law that Zelnis's Facebook posts are not protected by the First Amendment. Therefore, the Court grants Defendants' motion for summary judgment on Zelnis's First Amendment retaliation claim.

### D. Request for Declaratory Relief

Zelnis also brings a related claim, seeking declaratory judgment that he "has a right to engage in public speech which includes criticism of work schedule matters of public law enforcement agency," that a sheriff has no "right to impose an adverse action on a law enforcement

---

[8] Even if the Court had found that the Facebook posts (1) depicting images of skulls, (2) complaining that only "buddies" of the administration and union were told about upcoming shift changes, and (3) stating that Zelnis will put on a "show" at the next supervisor meeting were on matters of public concern, the same analysis contained above regarding the factors of the balancing test would lead the Court to find that these posts, too, do not receive constitutional protection from the First Amendment.

officer for having engaged in protected speech," and that "an employer does not have a right to impose a suspension on a law enforcement officer engaging in protected speech." (Compl. at 7, ECF No. 1). Defendants argue that, since Zelnis did not engage in speech protected by the First Amendement, he is not entitled to declaratory relief.

The Court may declare the rights of the parties as provided by 28 U.S.C. § 2201, which requires a showing that the plaintiff "has sustained, or is in immediate danger of sustaining, a direct injury as the result of the defendan[ts' ]conduct." *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 437 (7th Cir. 1994); *accord Northland Ins. Co. v. Gray*, 240 F. Supp. 2d 846, 848 (N.D. Ind. 2003). Zelnis, by not prevailing on summary judgment as to the First Amendment retaliation claim, has not shown that he was damaged by Defendants' conduct, nor has he shown that he is in any immediate danger of sustaining a direct injury as a result of Defendants' conduct. Summary judgment on this claim is also appropriate.

## CONCLUSION

Based on the above, the Court hereby **GRANTS** the Joint Motion for Summary Judgment by All Defendants [DE 36]. The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Defendants on all counts.

SO ORDERED on January 6, 2025.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT